

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

December 15, 2025

**BY ECF AND EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Arlasa Davis*, S1 25 Cr. 178 (JSR)

Dear Judge Rakoff:

    The Government respectfully submits this letter in advance of the sentencing of Arlasa Davis, which is scheduled for December 22, 2025. For the reasons set forth below, the Government submits that a sentence of at least 50 months' imprisonment, followed by three years of supervised release, would be sufficient but not greater than necessary to serve the purposes of sentencing. A significant term of imprisonment is necessary to adequately punish and deter the defendant, a former public official employed by the United States Department of Agriculture, for her pivotal role in a sprawling fraud and bribery scheme that ultimately resulted in over $66 million in losses.

### I.    Background

#### A.    Overview of the SNAP Federal Aid Program

    The Supplemental Nutrition Assistance Program ("SNAP"), which is administered by the USDA, uses federal funds to help low-income households buy food. Monthly benefits are provided to families on Electronic Benefit Transfer ("EBT") cards, which function like debit cards and may be used only at retailers authorized to accept them. SNAP benefits are financial obligations of the United States and are redeemable at face value through the United States Treasury. As of earlier this year, over 20 million households received SNAP benefits. (Presentence Report ("PSR") ¶ 12.)

    In order for someone to redeem SNAP benefits, a recipient swipes an EBT card at an authorized store and enters a personal identification number ("PIN"). (*Id.* ¶ 13.) The system verifies the PIN and available balance and, if approved, debits the recipient's account and credits the retailer's bank account. However, recipients can only redeem SNAP benefits at authorized retailers. In order to lawfully accept SNAP benefits, retailers must obtain a unique seven-digit authorization number from FNS. (*Id.* ¶¶ 15, 20.) Retailers are eligible to receive these FNS numbers only after an inspection process designed to ensure that the store maintains adequate inventory of SNAP-eligible food items, has proper storage and refrigeration facilities, operates as a legitimate business primarily engaged in food retail, and complies with program regulations

prohibiting the sale of ineligible items or benefits-for-cash exchanges. (*Id.* ¶ 20.) As a result, an FNS license functions as the "gateway" for legitimate SNAP transactions, allowing the USDA to track benefit redemptions and ensure the integrity of the food stamp program. (*Id.*)

### B. The Defendants' Scheme

Rather than navigating this legitimate process, the defendants sought to bypass it altogether in four steps.

First, Davis—using her official position at the USDA—accessed internal government databases and extracted legitimate FNS numbers assigned to authorized retailers across the country. As described *infra,* Davis documented these numbers, often by photographing handwritten lists, and transmitted them to an intermediary (the "FNS Broker") in exchange for cash payments. (PSR ¶¶ 46–51). Second, the FNS Broker sold these stolen FNS numbers to the defendants and other retailers seeking to process SNAP benefits without authorization. Third, misappropriated numbers in hand, the remaining defendants, who were both store owners and payment processors, helped orchestrate the illegal installation of EBT terminals in unauthorized retail locations across New York City. Fourth and finally, once in place, these unauthorized terminals enabled participating stores—including several owned directly by the defendants—to process tens of millions of dollars in fraudulent SNAP transactions. The FNS numbers involved in the scheme—including those stolen by Davis—ultimately redeemed over $66 million in unauthorized SNAP funding, over half of which is directly attributable to the license numbers Davis sold for cash bribes.

Because these stores were not authorized SNAP retailers and operated without any oversight, the illegal terminals enabled the sale of items categorically ineligible for SNAP, including alcohol, tobacco products, and other non-food goods. They also facilitated benefits-for-cash schemes in which recipients exchanged their SNAP benefits for cash at steep discounts, converting taxpayer-funded food assistance into cash while store owners such as Alrawashdeh and Obaid pocketed the difference as pure profit.

For Kehoe, the payment processor who was the architect of the scheme, each illegal terminal he sold and installed earned him per-terminal incentive fees, in addition to a lucrative commission each time an EBT card was swiped at one of his terminals. For store owners like Obaid and Alrawashdeh, access to black-market licenses like those sold by Davis enabled them to quickly and cheaply install EBT terminals in their stores. Those illegal terminals ensured a steady stream of fraudulent SNAP transactions, allowing Obaid, Alrawashdeh, Kehoe, and the other defendants to collect illicit profits far exceeding what these stores could legitimately process in food sales.

### C. Davis's Role in the Scheme

Davis began working for the USDA in 1987. (*Id.* ¶¶ 47, 114.) As of April 2025, Davis was a program specialist assigned to the Retailer Compliance Division, Investigative Analysis Branch of the Office of Retailer Operations and Compliance ("ROC"), where she earned annual salary of approximately $117,000. FNS's Office of Retailer Operations and Compliance, among other roles, is responsible for ensuring compliance among retailers who participate in the SNAP program, including by analyzing transaction data, investigating potential violations, disqualifying

Hon. Jed S. Rakoff
November 18, 2025
Page 3 of 9

retailers from participating in SNAP, and providing educational resources to retailers to help them understand program rules and compliance requirements.  For over three decades, Davis's role in the USDA provided her with special access to sensitive government databases used to award, monitor, and revoke FNS licenses assigned to authorized retailers across the country.  (*Id.* ¶ 48.)  Beginning in at least 2022, and continuing until law enforcement executed a judicially-authorized search warrant and seized her electronic devices in May 2025, Davis abused that position of trust by selling dozens of FNS licenses in exchange for cash bribes.  (*Id.* ¶ 52.)

For three years, Davis—working hand-in-hand with the FNS Broker, who was not affiliated with the USDA—stole dozens of FNS licenses from the USDA and sold them for between $500 to $1500 per license.  (*Id.* ¶ 50.)  During the workday, Davis used her government-issued computer and credentials to illegally access databases of FNS licenses, select FNS numbers, copy them by hand or take photographs of them, and then sell those numbers to third parties, including the FNS Broker.  (*Id.* ¶¶ 48-50.)

In total, Davis received at least $48,470 in cash bribes.  (*Id.* ¶ 52.)  Davis only ceased participating in the scheme after law enforcement executed a search warrant on her home in or about April 2025 and seized her electronic devices.  (*Id.* ¶ 47.)  Indeed, just one month prior, Davis had contacted the FNS Broker to ask if the FNS Broker wanted additional stolen licenses, accompanied by a photograph of additional FNS numbers.  (*Id.* ¶ 51.)  Throughout the length of the conspiracy, Davis also went to significant lengths in order to avoid detection both within the USDA and from law enforcement, including selling FNS licenses through an intermediary, using codewords when discussing both the stolen FNS licenses and the cash bribes she accepted in exchange for them, and disguising the deposits of bribes in her bank account as legitimate payments.  (*Id.* ¶¶ 48-52.)

Davis's role, however, was not limited to the illegal theft and sale of FNS licenses.  Many of the FNS licenses that Davis stole as part of the scheme were rapidly reused and distributed by the defendants across dozens of retail stores connected to the conspiracy, often triggering fraud-detection alerts within the USDA and resulting in the suspension of those licenses.  When Davis learned that the FNS licenses she had provided were under review or had been suspended, Davis would supply the FNS Broker with replacement FNS numbers so that the illegal terminals she was enabling could continue operating without interruption.  (*Id.* ¶ 49.)  Davis also regularly used USDA databases to monitor activity associated with the FNS licenses she had stolen and sold, and even proactively communicated with the FNS Broker about anti-fraud measures used by the USDA to detect schemes like the defendants' scheme.  (*Id.* ¶ 48-50.)  Because EBT terminals require a legitimate FNS number to be programmed into the terminal in order to operate, Davis's theft of FNS licenses was not only the first step in the scheme but was essential to it.  Davis's co-conspirators openly discussed the importance of finding new FNS numbers, as well as their inability to activate new terminals without the additional licenses that Davis and the FNS Broker would supply.  (*Id.* ¶ 39-42.)

The impact of Davis's corruption was vast: just the FNS licenses Davis stole and sold for cash bribes resulted in a loss of $36 million in unauthorized EBT transactions across the United States, more than half the total loss of $66 million attributed to the conspiracy.  (PSR ¶ 55).

    D.  <u>Procedural History and the Applicable Guidelines Range</u>

On May 28, 2025, a grand jury in this District returned an indictment charging Davis with conspiracy to commit bribery, bribery, and conspiracy to commit honest services wire fraud, among other offenses.[1] On August 20, 2025, Davis pled guilty to bribery and conspiracy to commit bribery, in violation of Title 18, United States Code, Sections 371, 201(b)(2)(B) and (C), which are Counts Four and Five of the Superseding Indictment.

Davis pled guilty pursuant to a written plea agreement (the "Plea Agreement") that contained a stipulated Guidelines calculation. That calculation matches the Guidelines calculation in the Presentence Investigation Report ("PSR"). (*See* PSR ¶¶ 65-78). Specifically, the Plea Agreement and PSR provide that Davis's total offense level is 35, her Criminal History Category is I, and that, as a result, the Stipulated Guidelines Range is 168 months to 210 months. The Probation Office recommends a term of 12 months and one day of imprisonment.

As part of that Guidelines calculation, the parties stipulated that the loss amount attributable to Davis is $66 million. (PSR ¶ 55). This figure represents a conservative estimate of the total value of unauthorized SNAP transactions processed through the illegal EBT terminals operating as part of the conspiracy, including those operating under the illegal FNS licenses that Davis stole and sold in exchange for cash. Under the plea agreement, Davis has also agreed to forfeit $48,470, and to pay $36 million in restitution jointly and severally with her co-defendants.

## II. Discussion

### A. Applicable Law

Even after *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Sentencing Guidelines still provide guidance to sentencing courts. And district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 128 S. Ct. 586, 596 (2007).

Following a court's calculation of the appropriate Guidelines range, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a), when imposing a sentence. *Id.* & n.6. They are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the purposes of sentencing; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing—namely:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

---

[1] Mohamad Nawafleh, a co-defendant in the scheme, was also charged with failure to appear.

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. A Sentence to a Term of At Least 50 Months' Imprisonment Is Warranted

A sentence of to a term of at least 50 months' imprisonment would be sufficient, but not greater than necessary, to serve the purposes of sentencing in this case.

First, the seriousness of the defendant's conduct and the need to promote respect for the law support imposition of a substantial term of imprisonment. The hypocrisy of Davis's egregious betrayal of the public trust is only rivaled by the magnitude of the harm she caused to the very agency she served. For over three decades, the defendant, a former USDA employee, held a position of public trust—one in which she was responsible for administering and safeguarding an anti-poverty program from fraud and waste. Instead, the defendant abused her position for years to solicit and accept cash bribes, enabling the very fraud she was tasked with preventing. The defendant's conduct was not aberrational or a momentary lapse in judgment, and it was not merely a mistake—she accepted bribes on dozens of occasions over a three-year period. Moreover, when her co-conspirators were in jeopardy of being caught, Davis assisted them by providing replacement FNS numbers so that they could continue defrauding the United States Government. Put differently, far from passively transmitting "information," as Davis describes in her sentencing submission, Davis proactively helped her co-conspirators evade detection by law enforcement. Even worse, Davis did so while employed by the division of the USDA tasked with rooting out and preventing the very fraud she was herself enabling, using the sensitive tools entrusted to her in that role. For years, Davis repeatedly betrayed her employer, abused the position of trust she held, and ultimately betrayed the trust of the millions of Americans that the USDA serves, all in order to enrich herself.

In imposing significant terms of imprisonment in bribery and corruption cases, courts in this District have emphasized the unique harm that these offenses cause. For example, Judge Caproni observed in sentencing a New York City Housing Authority ("NYCHA") employee who accepted cash bribes that public corruption is "one of the most serious of all federal offenses" because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain." *United States v. Rupnarain*, No. 24 Cr. 125 (VEC), Dkt. 28 at 25 (S.D.N.Y. Aug. 5, 2024) (sentencing former city employee who accepted $83,100 in bribes in exchange for awarding half a million dollars of NYCHA contracts to 20-months' imprisonment).

Similarly, Judge Cote, in sentencing a different NYCHA employee to 15 months' imprisonment for accepting approximately $6,000 in bribes in exchange for no-bid contracts, described the offense as "a real betrayal" and remarking as follows:

> You betrayed your employer, you betrayed the city, you betrayed the residents of the houses at which you worked. This was a corruption of your job and your duties. You were given responsibility and authority, and instead, you used that to get money you had no right to. And corruption is a corrosive, destructive issue. People need to have faith in their government. They need to have faith in their public housing that it's a community resource that can be used to support those in need.

*United States v. Figueroa*, No. 22 Cr. 605 (DLC), Dkt. 27 at 17 (S.D.N.Y. Feb. 9, 2023).

And similarly, in a recent bribery case involving corrupt Drug Enforcement Administration ("DEA") officials, Judge Oetken called bribery of public officials "insidious [because] it undermines the public's faith in our system," further explaining that:

> There are a lot of countries around the world where this sort of corruption is routine, it's part of life, everyone expects it. One of the things that sets our country apart, at least in our aspirations and our ideals, is to be free of this sort of corruption.

*United States v. Costanzo*, No. 22 Cr. 281 (JPO), Dkt. 253 at 54 (S.D.N.Y. Apr. 24, 2024).

In addition to undermining the public's trust in the food stamp program, the defendant's conduct damaged the USDA's mission and, potentially, the wellbeing of the households the USDA serves. Over a period of years, Davis and her co-conspirators stole millions of dollars from SNAP. These were not abstract losses; they were taxpayer funds earmarked for an anti-poverty program. Every dollar Davis and her co-conspirators stole was a dollar unavailable for SNAP—meaning fewer resources to feed hungry children, support elderly individuals on fixed incomes, and assist people with disabilities who depend on SNAP for basic nutrition. A significant term of incarceration is needed to appropriately punish the defendant's repeated betrayal of the public trust for personal gain and to promote respect for the law. *See Rupnarain*, Dkt. 28 at 26 ("I think society expects public corruption to be treated seriously and for corrupt officials to be punished.").

Second, a sentence of at least fifty months' imprisonment is vital to deter others who may seek to engage in similar schemes—a factor that would not be adequately addressed with the non-incarceratory sentence the defendant seeks. By arresting Davis and her co-defendants, who together orchestrated one of the largest benefits frauds in history, the Government sought to send the message that this type of behavior will not be tolerated, and that anyone who attempts to steal public funds will face a steep penalty. However, this message is likely to ring hollow if Davis receives the non-incarceratory sentence she now seeks for repeatedly abusing her position of responsibility over the safety and well-being of some of the most vulnerable Americans. Any sentence imposed in this case must send a message to those who seek to illegally profit from positions of trust in local, state, or federal government agencies, or who seek to illegally misappropriate and spend SNAP benefits, that such conduct will not be tolerated and that serious consequences, including incarceration, will result.

Third, while the defendant points to her long employment history at the USDA and her history as a law-abiding member of society in her sentencing submission, the Court should reject

these characteristics as a basis for a non-incarceratory sentence. The defendant's lack of criminal history is already reflected in her Guidelines range. The defendant's history of meritorious service at the USDA also does not distinguish her. It is precisely by virtue of a history of service that bribery defendants are generally able to obtain the position of public trust that they then, in turn, exploit and use to solicit bribes. *See United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). In other words, an otherwise unblemished work history is often part and parcel of bribery and does not take the defendant out of the heartland of bribery offenses or defendants, all of whom—according to Probation's review of comparable cases in the past five years—received an average of 47 months' imprisonment. (PSR at 29.) In fact, it is precisely what is so concerning about the defendant's conduct: by virtue of her long employment and service, she was entrusted with a position of privilege and responsibility and chose to betray that position on multiple occasions by using it to her own advantage. Nor did these factors, or the six-figure salary and accompanying pension she collected from the USDA, deter or otherwise inhibit the defendant from acting on her greed. The Court should not grant leniency based on the same history of service that laid the foundation for the defendant's crimes.

Fourth, the Government submits that a sentence of at least 50 months' imprisonment is appropriate considering the defendant's relative culpability. To date, three of Davis's co-defendants have pled guilty and await sentencing: (1) Michael Kehoe, the owner of the payment processing company that orchestrated the conspiracy; (2) Gamal Obaid, a retail store owner who operated eight stores that functioned as hubs for the scheme, in addition to purchasing FNS numbers from Davis through the FNS Broker; and (3) Omar Alrawashdeh, another store owner who operated his own retail stores, acted as a sales agent for Kehoe by soliciting new retail store customers for Kehoe, and falsified records on Kehoe's behalf.

Among the defendants that have pled, the Government views Kehoe as by far the most culpable. He operated the payment-processing company that enabled the conspiracy, submitted the fraudulent applications, and coordinated the installation of illegal terminals across hundreds of retailers. While Davis profited less than Obaid, who would otherwise be the next most culpable member of the scheme, Davis's culpability is enhanced by her position as a USDA employee and the magnitude of financial harm she singlehandedly caused. As a result, the Government's view is that Davis is at least as culpable as Obaid, but that Davis's abuse of her position merits an additional term of incarceration beyond the 30 months' imprisonment the Court imposed on Obaid.

### C. The Defendant's Requested Sentence of Probation Should Be Rejected

In her submission, the defendant asks the Court to impose a term of up to five years' probation, coupled with community service. The sentence requested by the defendant is woefully inadequate to satisfy the purposes of sentencing. The arguments that the defendant advances in favor of the unusually lenient sentence she seeks should be rejected.

First, throughout her submission, the defendant attempts to minimize her role in the conspiracy, claiming that she acted based on unspecified financial pressures, and that—unlike her co-defendants—she "shared in none of the profits of the massive conspiracy." (Def. Mem. at 5.) The Court should reject the defendant's efforts to reduce her egregious misconduct to little more

than a dollar and cents comparison of how much each of the defendants benefited. For one, unlike her remaining co-defendants, Davis's actions singlehandedly generated over half of the $66 million loss in this massive fraud. While Davis may have profited less from her role in the scheme than some of her co-defendants, the corruption she enabled and the position of trust she abused enhances her culpability beyond the other retail store owners or sales representatives charged in the scheme. She also committed those actions while collecting a generous salary (and pension) from the agency she was attempting to defraud. Put differently, while all the defendants were motivated by greed, Davis's participation, unlike her co-defendants, required her to repeatedly betray the public trust.

Second, in her submission, the defendant relies on *United States v. Matos*, 24 Cr. 299 (JGLC), at Dkt. 34 (Feb. 28, 2025), a recent sentencing involving one of a series of former NYCHA employees who accepted bribes in exchange for award no-bid contracts, to argue that a term of probation is appropriate here. (Def. Mem. at 7.) For one, Matos's offense conduct—and the resulting Guidelines range—was only a fraction of the Guidelines range applicable to the defendant, reflecting his limited role in the scheme. More importantly, however, the defendant disregards several significant terms of incarceration imposed on other NYCHA defendants who accepted equivalent—and even lesser—numbers of bribes than the defendant. *See, e.g.*, *United States v. Gibbs*, 22 Cr. 534 (CM) (Feb. 8, 2023) (33 months' imprisonment for defendant who accepted $2,000 in bribes); *United States v. Figueroa*, 22 Cr. 605 (DLC) (Feb. 9, 2023) (15 months' imprisonment for defendant who accepted $6,000 in bribes). Indeed, as the range of sentences in *Matos* and the other recent NYCHA corruption sentences demonstrate, the guiding principle for the sentencing judges was not solely the amount of the bribe received, as Davis suggests, but a number of additional factors, including the total value of the no-bid contracts lost by the City of New York; the length of time the defendants participated in the bribery scheme; and evidence that the defendants took other steps to facilitate or conceal the scheme from law enforcement. On those metrics, and as the guidance from Probation about comparable defendants suggests, defendants with comparable culpability based on the total number and value of bribes taken have mostly been sentenced to lengthy prison terms, and nothing about this defendant warrants any different result.

For similar reasons, the Government also respectfully disagrees with Probation's recommended sentence of a 12-month term of imprisonment. While Probation states that the defendant claims to have been "unaware of the mechanics of the fraud" as well as the extent of the total loss, that could not be further from the truth. As discussed above, the defendant took affirmative steps to conceal the scheme from law enforcement, passed along information about compromised FNS numbers to the FNS Broker, and misappropriated additional license numbers when the numbers she had originally stolen triggered fraud alerts and were deactivated. The mechanics of the fraud would have been on full display for the defendant when she took each of those actions. Nor can the defendant credibly claim to have been ignorant as to the potential extent of the loss her actions were causing given her role in the very office of the USDA tasked with combatting fraud and waste within SNAP, and the steps she took to continue the scheme's operation by circumventing fraud-detection steps implemented by the USDA.

### III. Conclusion

For the foregoing reasons, the Government respectfully recommends a sentence of 50 months' imprisonment, followed by three years of supervised release, as sufficient but not greater than necessary to meet the objectives of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Georgia V. Kostopoulos
Joe Zabel
Assistant United States Attorneys
(212) 637-2212 / -1559

cc: Defense Counsel (by ECF and email)